UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

TERRY NEALEY, as the Trustee of
the Bankruptcy Estate of Larry          No. CV-06-5057-FVS
Shuckhart,

                Plaintiff,               ORDER

        v.

BNSF RAILWAY COMPANY,

                Defendant.

**THIS MATTER** comes before the Court for consideration of several motions.  Terry Nealey is represented by Steven C. Lacy and Stewart R. Smith.  BNSF is represented by Michael B. Love.

**BACKGROUND**

Prior to October 17, 2004, Larry Shuckhart worked for the BNSF Railway Company ("BNSF") in Pasco, Washington, as a "second-shift supervisor."  He reported to Don Hust, the General Manager.  Mr. Shuckhart drank to excess, ingested methamphetamine, and misused a company credit card.  When confronted by Mr. Hust, he admitted that he had a drug problem and asked to participate in BNSF's Employee Assistance Program ("EAP").  Not only did BNSF grant Mr. Shuckhart a leave of absence in order to do so, but its benefits administrator, MetLife, also began paying short-term disability benefits.

Some of Mr. Shuckhart's coworkers were aware of his personal problems.  After he left, rumors began to circulate.  As a result, Mr.

ORDER - 1

Hust spoke to the various shifts.  In response to questions from Mr. Shuckhart's coworkers, Mr. Hust confirmed that he had "issues" with alcohol, drugs, and use of his company credit card.

Mr. Shuckhart successfully completed the EAP and was authorized to return to work.  His first day back was January 31, 2005.  He met with Mr. Hust, who told him that he would now be working as the "rotating-shift supervisor."  Mr. Shuckhart asked whether he could apply for other supervisory positions when openings occurred.  "No," said Mr. Hust.  The rotating shift was Mr. Shuckhart's until he "quit or was fired."  Finally, Mr. Hust discussed Mr. Shuckhart's prior performance as a supervisor.  He noted that, during 2004, two employees had been injured while working under Mr. Shuckhart's supervision.  Mr. Hust warned that he would be fired if another injury happened on his shift.  Although Mr. Shuckhart was greatly distressed, he completed work on January 31st.  On February 1st, he called Mr. Hust and said he was experiencing numbness in his arms.  He said he was going to the doctor.  After the examination, he called Mr. Hust and said the doctor found nothing but speculated that the numbness could be a function of stress.  On February 2nd, Mr. Shuckhart overslept.  He called Mr. Hust and told him that he would coming to work.  Mr. Hust allegedly became angry, asking Mr. Shuckhart, "Do you want to work here or don't you?"  While Mr. Shuckhart responded in the affirmative, he did not report to work.  Later that day, he called Mr. Hust and said he had spoken to an EAP representative.  Mr. Hust asked Mr. Shuckhart whether he was using drugs.  He denied he was but said he "was afraid he might."  Shortly thereafter, he began a second leave of absence.  Once again, he began receiving short-term disability benefits.

ORDER - 2

During the first two weeks of February, Mr. Hust spoke to Heather Ethen-Pergament.  She is BNSF's "Regional Director Human Resources."  She advised Mr. Hust that Mr. Shuckhart was entitled to his old job when he returned from his leave of absence.  Mr. Hust did not inform Mr. Shuckhart of this development; nor did any other representative of BNSF.

Mr. Shuckhart was the subject of a number of email messages between BNSF officials.  On February 17th, Ms. Ethen-Pergament wrote her boss, Seven J. Klug:

> Steve:  Don Hust contacted Larry Shuckhart to see how he is doing.  Larry said he does not know what he wants to do when he returns from STD -- and asked if he could return as a carman at Pasco.  Northtown is where he has seniority -- Don does not want him as a carman at Pasco.  Larry said he has too much stress as a supervisor.  Larry is on STD -- still working on his "issues".  Does not seem as though Larry is enthusiastic about his supervisory job.
>
> Also, Don mailed him a letter requiring him to sign by the 16th (yesterday) -- acknowledging that he is required to continue to comply with EAP instruction.  Larry said it must have been lost in the mail as he juts [sic] got it yesterday.  We will verify when he signed for it.  If he falsified the information on when he received, perhaps we can move forward to remove him from exempt?
>
> Don is frustrated and I feel for him -- but as far as I can tell -- since Larry is off on STD -- we need to wait till his release before anything further can be done to correct this.

Mr. Klug responded promptly to Ms. Ethen-Pergament's message.  He wrote:

> I agree.  It doesn't look good for his return.  If and when he gets cleared, I think we can have a sit down with him and reiterate what is expected and if he does not respond favorably, remove him from his exempt position and have him

ORDER - 3

return to the craft.  Until we get to that point, we are
going to have to ride this out.

Are we close to 12 weeks of absence yet?  I think we could
safely combine the first part of his STD with this second
part, since his FMLA would be figured concurrently, thereby
giving us the freedom to fill his job when we get to 12
weeks.  There would be the risk that he comes back ready to
go and we have no where to place him and have to keep him as
an extra.  But my guess is that he is not going to return or
if he does return, give us the assurances we need to put him
back to work as a supervisor.

Approximately one month after the preceding exchange between Mr. Klug

and Ms. Ethen-Pergament, Mr. Shuckhart called her office.  She

returned his call the following Monday, which was March 14th.  After

speaking to him, she emailed Mr. Hust:

Don:  I spoke to Larry Shuckhart this morning ( at 11:36am)
and advised him that I was returning his call from last
Friday and has [sic] researched an answer to his question
(he asked me if he could return as a craftsman at Pasco).  I
reported to him that since he has seniority as a carman at
Mpls, that then [sic] is the only location that he has the
union/contractual right to go back to work to.  For him to
request to place back at any other location, would require
the General Foreman's approval (on both the leaving and
receiving end).  I also advised him that work/performance
record is considered and a placement at Pasco is probably
not likely.  He than asked if relo benefits were provided
and I advised him to check with the union rep to see what
the contract might provide for, but that I did not think so
in this set of circumstances.  He then said that he cannot
afford to move at this time -- and "I guess I am back to
square one".

So, as you noted, his FMLA expires this month and we can then
post his job and fill it.  When he is released from STD, he has
60 days to place on a job (exempt if he posts on a job and is
selected, or return to his craft job).

Also, got your VMS.  What are the details on the VISA.

ORDER - 4

> Didn't we set a deadline with him to settle this account?
> Let me know.

Its unclear whether Mr. Shuckhart spoke with Ms. Ethen-Pergament after March 14th.

Mr. Shuckhart exhausted his short-term disability benefits and applied for long-term disability benefits. On June 2nd, MetLife denied his application. As a result, he had 180 days -- *i.e.*, until December 5th -- in which to appeal MetLife's decision.

BNSF officials questioned whether Mr. Shuckhart was complying with all of the duties required of EAP participants. On June 30, 2005, Martin M. Crespin, whose title is "Manager Medical Support Services," issued a letter prohibiting Mr. Shuckhart from returning to work until the matter of compliance was resolved.

Mr. Shuckhart did not appeal MetLife's denial of his application for long-term disability benefits. Consequently, on December 5, 2005, Ms. Ethen-Pergament sent a letter warning him that he would be fired if he did not obtain a position within 60 days. He made some efforts to obtain another position, but was unable to do so.

BNSF fired Mr. Shuckhart on March 13, 2006. On July 21st, he filed this action. He alleges that BNSF violated the Family Medical Leave Act, that BNSF discriminated against him in violation of the law of the State of Washington, that Mr. Hust tortiously invaded his privacy by disclosing private facts, and that BNSF breached a promise of specific treatment.

The Court has original jurisdiction over the federal claims. 28 U.S.C. § 1331. The Court may exercise supplemental jurisdiction over the state claims. 28 U.S.C. § 1367.

BNSF moves for summary judgment. Fed.R.Civ.P. 56.

ORDER - 5

One of BNSF's arguments is that Mr. Shuckhart lacks standing to assert the claims listed above.  As BNSF observes, Mr. Shuckhart filed a bankruptcy petition under Chapter 13 of the Bankruptcy Code on December 9, 2002.  On August 29, 2006, he moved to convert his case from Chapter 13 to Chapter 7.  He received a Chapter 7 discharge on December 6, 2006.  At no time, however, did he amend his bankruptcy schedules to reflect his claims against BNSF.  In response to BNSF's argument, Mr. Shuckhart asked the Court to substitute the bankruptcy trustee, Terry Nealey, as the plaintiff in this action on behalf of the Bankruptcy Estate.  The Court granted Mr. Shuckhart's request, while reserving ruling on all other issues raised by his failure to amend his bankruptcy schedules.  Since Mr. Nealey has been substituted as the plaintiff, the term "plaintiff," as used herein, refers to Mr. Nealey, not to Mr. Shuckhart.

**FAMILY MEDICAL LEAVE ACT**

Mr. Shuckhart's drug and alcohol problems constituted a "serious health condition" for purposes of the Family Medical Leave Act ("FMLA").  29 U.S.C. § 2611(11).  Pursuant to 29 U.S.C. § 2612(a)(1)(D), he was authorized to take a leave of absence in order to seek treatment.  Given the manner in which BNSF calculates leave under the FMLA, he was permitted to take up to 12 weeks off during both 2004 and 2005.  *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1126 (9th Cir.2001).  Upon his return to work, he was entitled to the position that he held when the leave of absence commenced, 29 U.S.C. § 2615(a)(1)(A), or to "an equivalent position with equivalent . . . terms and conditions of employment."  29 U.S.C. § 2615(a)(1)(B).  However, his right to reinstatement was subject to a significant limitation.  He had to be able to perform the essential functions of

ORDER - 6

his former job.  29 C.F.R. § 825.214(b) ("[i]f the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA").  *Cf. Hendricks v. Compass Group, USA, Inc.*, 496 F.3d 803, 806 (7th Cir.2007) ("Hendricks was unable physically to perform the duties of a utility driver, and thus she was not entitled to return to the same or equivalent position"); *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 514 (6th Cir.2006) (where there were no material disputes concerning the employee's inability to perform her former job at the conclusion of her 12-week FMLA leave of absence, her employer had the right to fire her); *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 861 (8th Cir.2006) (as "Battle and his physicians admitted that he could not perform [the] essential functions [of his former job] when he initially sought return to work, the district court did not err in granting summary judgment to UPS"); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155 (2nd Cir.1999) ("[t]he fact that Sarno was not restored to his position at the end of that 12-week period did not infringe his FMLA rights because it is also undisputed that at the end of that period he remained unable to perform the essential functions of his DEGI position").

A. Reinstatement After First Leave of Absence

BNSF authorized Mr. Shuckhart to return to work on January 31, 2005.  Presumably, BNSF would not have done so unless he had successfully completed the EAP and was able to perform the essential functions of the job which he held before he entered the program.  29 C.F.R. § 825.214(b).  As a result, he was entitled to "the same position [he] held when leave commenced, or to an equivalent position

ORDER - 7

with equivalent benefits, pay, and other terms and conditions of employment." 29 C.F.R. § 825.214(a). Clearly, he was not reinstated to his former position. The issue, then, is whether his new position was equivalent to the old one. It was not. If an employee performs shift work, he "is ordinarily entitled to return to the same shift or the same or an equivalent work schedule." 29 C.F.R. § 825.215(e)(2). Contrary to this regulation, Mr. Hust assigned Mr. Shuckhart to a less desirable shift upon his successful completion of the EAP. By doing so, he violated the FMLA. As it turned out, the violation was short lived. On February 2nd, Mr. Shuckhart entered the EAP a second time.

B. Exacerbation

During oral argument, the plaintiff suggested that BNSF precipitated Mr. Shuckhart's second leave of absence by failing to reinstate him to his former position. There are at least two reasons why this allegation does not create a jury issue. First, the relationship, if any, between BNSF's violation of the FMLA and Mr. Shuckhart's decision to take a second leave of absence is complex. Psychological or psychiatric evidence is necessary to establish the existence of a causal relationship. None has been submitted. Second, the plaintiff has failed to cite, and independent research has failed to uncover, precedent authorizing an employee to obtain relief under the FMLA on the ground that his employer exacerbated a serious health condition by failing to reinstate him to his former job. The only circuit that has considered this issue is the Sixth. *Edgar*, 443 F.3d at 514-16. As the Sixth Circuit views it, § 825.214(b) is not concerned with the reason why an employee cannot perform the essential functions of his former job; all that matters is that he cannot do so. Consequently, in the Sixth Circuit, an employee cannot create a jury

ORDER - 8

issue under § 825.214 by offering evidence indicating that his ability to perform the essential functions of his former job was impeded by his employer's failure to reinstate him.  443 F.3d at 516.  Whether the Ninth Circuit will follow *Edgar* remains to be seen.  However, at least one district court in this circuit has done so.  *Santrizos v. Evergreen Federal Savings and Loan Association*, No. 06-886-PA, 2007 WL 3544211, at *7 (D.Or. Nov. 14, 2007).

C. Constructive Discharge

An employer may not interfere with an employee's FMLA rights.  29 U.S.C. § 2615(a)(1).  The plaintiff alleges that Mr. Hust interfered with Mr. Shuckhart's FMLA rights by making work intolerable for him upon his return from the first leave of absence.  Although the plaintiff does not describe Mr. Shuckhart's predicament as "constructive discharge," that is the term which best describes the plaintiffs' allegation.  The Ninth Circuit has not decided whether an employee may obtain relief under § 2615(a)(1) for constructive discharge.  Other circuits have recognized that this is a potential ground for relief under the FMLA.  *See, e.g., Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 771-2 (5th Cir.2001).  If the Ninth Circuit follows suit, it is likely to apply principles of law that have developed under federal antidiscrimination statutes.  The principles that the Ninth Circuit is likely to apply make it difficult to prove a claim of constructive discharge.  This is not accidental.  As the Ninth Circuit observed recently, "We set the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his

ORDER - 9

employment situation was intolerable." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir.2007).  In order to prevail, the plaintiff must present evidence from which a reasonable jury could find that Mr. Shuckhart's new job was "'so intolerable," from an objective point of view, "'that a reasonable person in [his] position would have felt compelled to resign[.]'" *Id.* (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004)).  It is true that some aspects of Mr. Shuckhart's new job were discouraging. He had to work a less desirable shift.  He could not apply for other supervisory jobs, and he was warned that he would be fired if one of his subordinates was injured while under his supervision.  While these circumstances arguably made work more stressful, they were far from intolerable.  Mr. Shuckhart was not demoted.  He continued to perform the same type of work, and he continued to receive the same pay and benefits.  Given these undisputed facts, no reasonable person in Mr. Shuckhart's position could have decided, after just one day work, that he had no choice but to find another position.

        D. Reinstatement After Second Leave of Absence

        The plaintiff argues that BNSF had a duty to advise Mr. Shuckhart that he was entitled to his former position at the end of his second leave of absence.  According to the plaintiff, BNSF breached that duty; thereby perpetuating the false impression that Mr. Shuckhart would be required to continue working the rotating shift until he quit or was fired.  The plaintiff argues that BNSF's failure to correct this false impression deprived Mr. Shuckhart of his right to reinstatement after his second leave of absence.  Whether BNSF breached a duty to provide supplemental oral notice is unclear.  The Court need not resolve this issue unless Mr. Shuckhart was prejudiced

ORDER - 10

by BNSF's failure to correct the false impression created by Mr. Hust.
*Cf. Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89, 122 S.Ct.
1155, 1161, 152 L.Ed.2d 167 (2002) ("§ 2617 provides no relief unless
the employee has been prejudiced by the violation").  Mr. Shuckhart
suffered no prejudice if he was ineligible for reinstatement at the
conclusion of his second leave of absence.  As explained above, his
eligibility for reinstatement depended upon his ability to perform the
essential functions of his former job.  29 C.F.R. § 825.214(b).
Making such a showing is a formidable task for the plaintiff.  After
all, Mr. Shuckhart worked just one day between his first and second
leaves of absence.  A single day of work is not enough to establish
recovery from drug and alcohol problems; especially considering the
events that occurred during the Spring and Summer of 2005.  By June,
the officials who were responsible for monitoring Mr. Shuckhart's
participation in the EAP had become concerned that he was not
fulfilling his obligations.  On the 30th of June, Mr. Crespin sent a
letter to BNSF's Superintendent of Field Operations.  "[Mr. Shuckhart]
*may not return to work under any circumstances*," he wrote, "*without
written notification from the Medical & Environmental Health
Department*."  (Emphasis in the original.)  Mr. Shuckhart acknowledges
receiving a copy of Mr. Crespin's letter.  (Deposition of Larry
Shuckhart (September 14, 2007), at 27-28.)  Despite the letter's
imperative language, and despite the fact it prohibited him from
working for BNSF, he did not respond.  His silence strongly suggests
that his drug and alcohol problems remained unresolved despite two
leaves of absence.  He now insists that he was fulfilling the
requirements of the EAP.  (*Id.* at 10-12.)  However, he has made no
effort to document that he was in compliance.  Nor has he provided

ORDER - 11

testimony from anyone indicating that, during the Spring of 2005, he was capable of performing the essential functions of his former job or, for that matter, any other job within the company.  Consequently, the record does not contain enough information to create a jury issue concerning his eligibility for reinstatement after his second leave of absence.

## DISABILITY DISCRIMINATION

The plaintiff seeks relief under the State of Washington's law against disability discrimination.  He is asserting at least two claims.  One alleges disparate treatment.  The other alleges failure to accommodate.  *See Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 145, 94 P.3d 930 (2004) (distinguishing disparate treatment and failure-to-accommodate claims).

### A. Terms or Conditions

An employer may not "discriminate against any person in . . . [the] terms or conditions of employment because of . . . the presence of any sensory, mental or physical disability."  RCW 49.60.180(3). The plaintiff seeks to create a triable issue of disparate treatment by means of the *McDonnell-Douglas* burden-shifting framework.  *Cf. Anica v. Wal-Mart Stores, Inc.*, 120 Wn. App. 481, 487, 84 P.3d 1231 (2004) (approving the use of the *McDonnell-Douglas* approach in the context of a disability discrimination claim).[1]  In order to qualify for the rebuttable presumption of discrimination, the plaintiff must offer evidence establishing four elements:  First, Mr. Shuckhart was in a protected class (*i.e.*, he was disabled).  Second, he suffered an

_____

[1]*McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 1824-26, 36 L.Ed. 2d 668 (1973).

ORDER - 12

adverse employment action.  Third, he was doing satisfactory work prior to the adverse employment action, and fourth, he was treated differently than someone not in the protected class.  *Kirby v. City of Tacoma*, 124 Wn. App. 454, 465, 98 P.3d 827 (2004), *review denied*, 154 Wn.2d 1007, 114 P.3d 1198 (2005).

As far as the first element is concerned, the plaintiff argues that Mr. Shuckhart's problems with alcohol and drugs constituted a disability.  BNSF does not necessarily disagree.  As far as the second element is concerned, the plaintiff argues that Mr. Shuckhart's reassignment to a less desirable shift constituted an adverse employment action.  Whether the shift change constituted an adverse employment action is a close question.  *See id.* ("[a]n actionable adverse employment action must involve a change in employment conditions that is more than an inconvenience or alteration of job responsibilities, . . . [it must be a change] such as reducing an employee's workload and pay").  *Cf. Tyner v. State*, 137 Wn. App. 545, 554, 565, 154 P.3d 920 (2007) (reassignment to different work site was not an adverse employment action where the employee suffered no loss in pay or benefits and where she was allowed shorter working hours to account for her longer commute).  Even assuming the shift change constitutes an adverse employment action, the plaintiff must show that Mr. Shuckhart's performance was satisfactory.  This is the third element of a prima facie case.  BNSF denies that the plaintiff has established satisfactory performance, citing Mr. Shuckhart's abuse of alcohol and methamphetamine before he took his first leave of absence.

The plaintiff need not offer a great deal of evidence at this stage of the *McDonnell-Douglas* process in order to rebut BNSF's contention.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S.

ORDER - 13

248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous."). *Cf. Griffith v. Schnitzer Steel Indus., Inc.*, 128 Wn. App. 438, 449 n.6, 115 P.3d 1065 (2005) ("Because satisfactory performance is viewed in light of all the evidence presented, summary judgment for the employer on this basis will rarely, if ever, be appropriate."). Nevertheless, the plaintiff must present some evidence indicating that Mr. Shuckhart's job performance prior to his first leave of absence was satisfactory. This is necessary to rule out the possibility that Mr. Shuckhart's reassignment was based upon inadequate performance rather than disability. *See Aragon v. Republic Silver State Disposal*, 292 F.3d 654, 659 (9th Cir.2002).[2] The only evidence in the record concerning pre-EAP job performance is that it was unsatisfactory. Not only was he abusing alcohol and drugs, but also he admitted to Mr. Hust that he had used his company credit card to obtain cash for gambling. Granted, Mr. Shuckhart made a serious effort to address his alcohol and drug problems during the Fall of 2004. But while he successfully completed the EAP and received permission to return to work, he was on the job for just one day. He never returned to work after January 31, 2005. Given his extended history of drug and alcohol abuse, one day on the job is not enough to demonstrate that he was capable of performing the essential functions

---

[2]The fact that Mr. Shuckhart once met his employer's legitimate expectations is not dispositive. "[W]hether one is qualified may change from time to time. The fact that an individual may have been qualified in the past does not mean that he is qualified at a later time." *Grohs v. Gold Bond Building Products*, 859 F.2d 1283, 1287 (7th Cir.1988).

ORDER - 14

of a supervisor.  Absent evidence of satisfactory work, the plaintiff cannot establish a prima facie case of disparate treatment in violation RCW 49.60.180(3).  BNSF is entitled to dismissal of this claim.  *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 181, 23 P.3d 440 (2001) ("[u]nless a prima facie case of discrimination is set forth, the defendant is entitled to prompt judgment as a matter of law"), *overruled on other grounds by, McClarty v. Totem Elec.*, 157 Wn.2d 214, 137 P.3d 844 (2006).

B. Discriminatory Discharge

An employer may not " discharge . . . any person from employment because of . . . the presence of any sensory, mental, or physical disability."  RCW 49.60.180(2).  If the plaintiff is alleging discriminatory discharge, he must establish all of the elements of a prima facie case in order to qualify for the rebuttable presumption of discrimination.[3]  He cannot do so given the paucity of evidence concerning Mr. Shuckhart's pre-EAP job performance.  The Court could stop at this point in the *McDonnell-Douglas* process and grant summary judgment.  *See Hill*, 144 Wn.2d at 181.  Nevertheless, in the interest of completeness, the Court will proceed to the next step.

When an employee establishes a prima facie case, "a legally mandatory, rebuttable presumption of discrimination temporarily takes hold . . . and the evidentiary burden shifts to the defendant to produce admissible evidence of a legitimate, nondiscriminatory explanation for the adverse employment action sufficient to raise a

[3]It is not entirely clear whether the plaintiff is alleging that BNSF violated RCW 49.60.180(2) by firing Mr. Shuckhart on March 13, 2006.  Since BNSF has addressed this issue, the Court will too.

ORDER - 15

genuine issue of fact as to whether the defendant discriminated against the plaintiff." *Hill*, 144 Wn.2d at 181 (internal punctuation and citations omitted).  BNSF has provided a legitimate explanation for its decision to fire Mr. Shuckhart; namely, that he did not return to work as a supervisor and did not obtain another position with the company.[4]  The plaintiff argues that a reasonable jury could reject BNSF's proffered explanation and find that Mr. Shuckhart's drug and alcohol abuse was a substantial motivating factor in the company's decision.  *Cf. Hines v. Todd Pacific Shipyards Corp.*, 127 Wn. App. 356, 371, 112 P.3d 522 (2005) ("to survive summary judgment[,] Hines need only show a reasonable . . . jury could find his disability was a substantial motivating factor for the employer's adverse actions").  As support for his contention that BNSF's explanation is a pretext for discrimination, the plaintiff cites evidence indicating that Mr. Hust did not want Mr. Shuckhart to work for the company in Pasco after his return from the first leave of absence.  However, the fact that Mr. Hust was ill-disposed toward Mr. Shuckhart -- even if true -- is not enough to create a jury issue.  The plaintiff also must present evidence from which a reasonable jury could find that Mr. Hust's antipathy was a proximate cause of Mr. Shuckhart's discharge.  *See*

---

[4]A reasonable jury arguably could find that BNSF officials were influenced by their perception that Mr. Shuckhart was not complying with the terms of the EAP.  *See supra* pp. 11-12. However, unless the jury also found that BNSF officials were incorrect, such a finding would not help the plaintiff avoid summary judgment because an employee's failure to complete necessary drug treatment is a permissible ground for discharge. *See, e.g., Rhodes v. URM Stores, Inc.*, 95 Wn. App. 794, 800, 977 P.2d 651, *review denied*, 139 Wn.2d 1006 (1999).

ORDER - 16

*Fell v. Spokane Transit Auth.*, 128 Wn.2d 618, 640-42, 911 P.2d 1319 (1996) (RCW 49.60.215).[5]

The plaintiff does not allege that Mr. Hust was the person who ultimately decided to fire Mr. Shuckhart. To the contrary, the plaintiff seems to be relying on a theory of "subordinate bias"; that is to say, he seems to be alleging that Mr. Hust set in motion a chain of events that ultimately caused Mr. Shuckhart's discharge. Once again, the Ninth Circuit's decision in *Poland* is instructive:

> [T]o establish the essential element of causation in a subordinate bias case -- where the investigation that led to the adverse employment decision was initiated by, and would not have happened but for, the biased subordinate -- the plaintiff must show that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or the investigation leading thereto.

*Id.* at 1184.[6] Assuming the Supreme Court of the State of Washington adopts the preceding rule (or one like it), the plaintiff must document Mr. Hust's role in the decisionmaking process in order to avoid summary judgment. To some extent, he has done so. The record reflects that Mr. Hust told Ms. Ethen-Pergament he was frustrated with

---

[5]Although proximate cause is a question of fact, *see Fell*, 128 Wn.2d at 641, a question of fact may be resolved as a matter of law if reasonable minds cannot differ and the evidence permits but one conclusion. *See Quicksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 759 (9th Cir.2006) (citing *Sanders v. Parker Drilling Co.*, 911 F.2d 191, 194 (9th Cir.1990)).

[6]*Poland* is not precedent. Nevertheless, as the Washington Supreme Court has explained on a number of occasions, state appellate courts may consider federal antidiscrimination jurisprudence when resolving issues of state law. *See, e.g., Hill*, 144 Wn.2d at 180.

Mr. Shuckhart.  She communicated his frustration to Mr. Klug.
However, there is no evidence that either Ms. Ethen-Pergament or Mr.
Klug fired Mr. Shuckhart.  Nor is it clear who did.  Without this
information, it is impossible to determine whether the ultimate
decision was tainted by Mr. Hust's alleged bias against Mr. Shuckhart.
In other words, it is impossible to determine whether a reasonable
jury could find a causal relationship between Mr. Hust's alleged bias
and Mr. Shuckhart's termination.  Absent such a relationship, the
plaintiff cannot prove that BNSF violated RCW 49.60.180(2) by firing
Mr. Shuckhart on March 13, 2006.

C. Accommodation by Reassignment

The plaintiff alleges that BNSF had a duty to accommodate Mr.
Shuckhart's disability by helping him find another job within the
company.  The plaintiff must prove four elements in order to establish
a prima facie case of disability discrimination based upon failure to
accommodate:

> "(1) the employee had a sensory, mental, or physical
> abnormality that substantially limited his or her ability to
> perform the job; (2) the employee was qualified to perform
> the essential functions of the job in question; (3) the
> employee gave the employer notice of the abnormality and its
> accompanying substantial limitations; and (4) upon notice,
> the employer failed to affirmatively adopt measures that
> were available to the employer and medically necessary to
> accommodate the abnormality."

*Riehl*, 152 Wn.2d at 145 (quoting *Hill v. BCTI Income Fund-I*, 144 Wn.2d
172, 192-93, 23 P.3d 440 (2001)).

It is undisputed that the plaintiff's drug and alcohol abuse
constituted a sensory, mental, or physical abnormality that
substantially limited his ability to perform his job.  He requested a

ORDER - 18

specific accommodation; *viz.*, permission to participate in the EAP. BNSF granted his request.  After returning to work for a single day, he decided the new job was too stressful and he could not perform it. (Declaration of Larry Shuckhart, ¶ 15, at 5.)  He asked to participate in the EAP a second time.  BNSF granted his request without hesitation.  The second leave of absence differed from the first leave of absence in one respect.  It was based upon stress as well as drug and alcohol problems.  By granting the second leave of absence, BNSF arguably acknowledged that Mr. Shuckhart needed accommodation for work-related stress.  *Cf. Riehl*, 152 Wn.2d at 147-48 (employee must show that he provided his employer with "competent evidence establishing a nexus between the disability and the need for accommodation").  During the second leave of absence, Mr. Shuckhart inquired about less stressful jobs within BNSF.  According to the plaintiff, a genuine issue of material fact exists with respect to whether BNSF's efforts at accommodation were reasonable.  *See Davis v. Microsoft Corp.*, 149 Wn.2d 521, 538, 70 P.3d 126 (2003) ("the fact-finder must determine whether Microsoft's efforts were reasonably calculated to assist Davis in finding an alternative position within the company").

     The problem with the plaintiff's argument is that it assumes Mr. Shuckhart was qualified to perform some job within the company.  Given the record as it now stands, a reasonable jury could not find for him on this issue.  *See supra* pp. 11-12.  This is fatal to his failure-to-accommodate claim.  Freedom from drug and alcohol problems is a bona fide qualification for someone who works around locomotives.  *See Brady v. Daily World*, 105 Wn.2d 770, 777, 718 P.2d 785 (1986).  A person whose sensory, mental, or physical abnormality prevents him

ORDER - 19

from satisfying a bona fide qualification for a job cannot claim disability discrimination under Washington law. *Tinjum v. Atlantic Richfield Co.*, 109 Wn. App. 203, 209, 34 P.3d 855 (2001). Until Mr. Shuckhart showed BNSF that he had resolved his drug and alcohol problems (and, thus, was qualified to perform some job within the company), BNSF was under no obligation to accommodate his disability by reassigning him to another position. BNSF is entitled to summary judgment on the plaintiff's failure-to-accommodate claim.

**INVASION OF PRIVACY**

The Washington Supreme Court has recognized a common-law right to be free from public disclosure of private facts. *White v. Town of Winthrop*, 128 Wn. App. 588, 593, 116 P.3d 1034 (2005) (citing *Reid v. Pierce County*, 136 Wn.2d 195, 207, 961 P.2d 333 (1998)). The contours of the right are set forth in the *Restatement (Second) of Torts* § 652D (1977):

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
> (a) would be highly offensive to a reasonable person, and
> (b) is not of legitimate concern to the public.

*White*, 128 Wn. App. at 594 (quoting *Reid*, 136 Wn.2d at 205 (quoting Restatement, *supra*, § 652D)). Mr. Hust readily admits he told some of Mr. Shuckhart's coworkers that Shuckhart had issues with alcohol, drugs, and the use of his company credit card. The plaintiff alleges that Mr. Hust's statements to Mr. Shuckhart's coworkers were tortious under § 652D. BNSF argues that Mr. Hust's comments were too general to "be highly offensive to a reasonable person" and that, in any event, Mr. Shuckhart's coworkers already were aware of his problems.

ORDER - 20

BNSF may be correct, but the evidence is not so one-sided that a reasonable jury would be compelled to agree.

Even assuming a jury could find that Mr. Hust's comments were tortious, says BNSF, he is not the defendant. The company is. Thus, in order for the plaintiff to recover damages from BNSF, he must demonstrate that the company ("master") is responsible for the acts of Mr. Hust ("servant"). *Kuehn v. White*, 24 Wn. App. 274, 277, 600 P.2d 679 (1979) ("A master is responsible for the servant's acts under the doctrine of respondeat superior when the servant acts within the scope of his or her employment and in furtherance of the master's business."). According to BNSF, Mr. Hust was not acting pursuant to company policy when he made the comments attributed to him. *Id.* ("Where a servant steps aside from the master's business in order to effect some purpose of his own, the master is not liable."). BNSF's argument is unpersuasive. Mr. Hust says he was motivated by a desire to squelch workplace rumors. Protecting employee morale is something a general manager is expected to do. As a result, a jury could find that Mr. Hust was acting within the scope of his employment when he spoke to Mr. Shuckhart's coworkers about Mr. Shuckhart's absence from work.

**PROMISE OF SPECIFIC TREATMENT**

BNSF adopted a written "Policy on the Use of Alcohol and Drugs" which became effective September 1, 2003. In a company communication concerning the policy, the director of Medical Support Services, Art Freeman, was quoted as saying, "'We want to encourage employees to make self-referrals without fear of penalty so a treatable problem can be addressed as soon as possible[.]'" The plaintiff argues that Mr. Freeman's statement, when combined with the policy itself, constituted

ORDER - 21

a promise that Mr. Shuckhart would be restored to his former position when he returned from his first leave of absence. *See Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 230, 685 P.2d 1081 (1984) ("if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship"). The plaintiff's argument faces a significant obstacle. As BNSF points out, the policy contains a disclaimer. Section 12.1 of the policy states, "Nothing in this policy is intended or shall be construed to create or form the basis of an express or implied contract or covenant of employment between BNSF and any employee or group of employees." In order to avoid summary judgment, the plaintiff must offer evidence from which a reasonable jury could find that the disclaimer was not BNSF's last word on the subject. *See McClintick v. Timber Products Manufacturers*, 105 Wn. App. 914, 921-23, 21 P.3d 328 (2001). The plaintiff has not done so. For example, he has failed to cite any provisions in the policy that are inconsistent with the disclaimer. Nor has he cited any evidence that BNSF officials acted in a manner inconsistent with the disclaimer; that is to say, evidence indicating that they believed the policy required them to restore an employee to his former position upon successful completion of the EAP. *See id.* Absent evidence undermining the enforceability of the disclaimer (and there is none), the plaintiff has failed to create a jury issue with respect to the existence of an implied promise.

**CONCLUSION**

BNSF violated the FMLA by failing to reinstate Mr. Shuckhart to

ORDER - 22

his former position at the conclusion of his first leave of absence. The violation lasted until Mr. Shuckhart began his second leave of absence.

Genuine issues of material fact exist with respect to whether the statements that Mr. Hust made to Mr. Shuckhart's coworkers about Mr. Shuckhart's problems were tortious under the *Restatement (Second) of Torts* and whether BNSF is liable for damages if they were.

All of the plaintiffs' remaining claims are dismissed with prejudice.

**IT IS HEREBY ORDERED:**

1. BNSF's "Supplemental Motion for Summary Judgment" (**Ct. Rec. 47**) is granted in part and denied in part.

2. The parties' "Stipulated Motion for Leave to Modify the Scheduling Order" (**Ct. Rec. 79**) is denied as moot.

3. The parties' second "Stipulated Motion for Leave to Modify the Scheduling Order" (**Ct. Rec. 100**) is granted.  The parties may have until December 31, 2007, to complete discovery.

*4. The parties shall modify the caption of all future pleadings and papers to reflect the fact that Mr. Nealey is prosecuting this action in his capacity as the Trustee of Mr. Shuckhart's Bankruptcy Estate.*

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to enter this order and furnish copies to counsel.

**DATED** this __4th__ day of December, 2007.

                    ___s/ Fred Van Sickle___
                         Fred Van Sickle
                    United States District Judge

ORDER - 23